FREUNDLEGAL
Jonathan D. Freund (SBN 157357)
9229 Sunset Boulevard #303
West Hollywood, CA 90069
Tel: (310) 247-2165
Fax: (310) 247-2190
Email: jonathan@freundlegal.com

DILAURO TAX LAW PLLC
Justin H. DiLauro (TX SBN 24055404) (*pro hac vice pending*)
9639 Hillcroft Street, Suite 844
Houston, TX 77096
Tel: (713) 446-9537
Fax: (713) 456-2027
Email: jhd@dilaurotaxlaw.com
Attorneys for Plaintiff,
TITAN MUTUAL LENDING, INC.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

| | |
|---|---|
| TITAN MUTUAL LENDING, INC., a California corporation,<br><br>        Plaintiff,<br><br>    vs.<br><br>UNITED STATES OF AMERICA;<br><br>        Defendant. | Case No.<br><br>**CIVIL ACTION UNDER 26 U.S.C. § 7422; CLAIM FOR DELAYED TAX REFUND**<br><br><br><br>**DEMAND FOR JURY TRIAL** |

Titan Mutual Lending, Inc. (hereinafter "Plaintiff or "Titan Mutual"), by and through its undersigned counsel files this Complaint against Defendant, United States of America ("Defendant" or "United States") pursuant to 26 U.S.C. § 7422.  Plaintiff files this civil action for a federal tax refund totaling $ 5,060,452.52, plus interest, claimed for refund against Plaintiffs' payroll tax returns for quarterly tax periods ending June 30, 2020, September 30, 2020, December 31, 2020, March 31, 2021, June 30, 2021, and September 30, 2021 (the 2nd, 3rd & 4th quarters of 2020 and 1st, 2nd & 3rd quarters of 2021) that were duly and timely claimed and filed with the Defendant's nonparty agency, the Internal Revenue Service (the "IRS" or the "Service") on or before June 26, 2023, yet remain unchallenged and unpaid to Plaintiffs by the Defendant or the Service.

## I.    JURISDICTION, VENUE, AND PARTIES

1.    Jurisdiction of this Court is proper pursuant to 28 U.S.C. §§ 1340 and 1346.

2.    Venue of this Court is proper pursuant to 28 U.S.C. § 1402.

3.    Plaintiff, Titan Mutual Lending, Inc., is a stock corporation incorporated under the laws of the State of California, and whose principal place of business is at 13681 Newport Avenue, Suite 8126, Tustin, California 92780.

4.    Defendant is the United States of America and may be served by mailing two copies of this Complaint, along with a copy of the Court-issued Summons, by

certified mail to the civil-process clerk of the United States Attorney for the Central District of California at 312 N. Spring St. Suite 1200, Los Angeles, California 90012, and mailing two copies of the Complaint by certified mail to The Honorable Pamela Bondi, Attorney General of the United States, 950 Pennsylvania Avenue, NW, Washington, DC 20530-0001.

5.    Defendant's nonparty agency, the Internal Revenue Service (the "IRS" or the "Service"), has factual relevance to this action and is referenced throughout this Complaint, and the IRS may be additionally served by mailing two copies of this Complaint by certified mail, along with a copy of the Court-issued Summons, by certified mail to the Internal Revenue Service, 1111 Constitution Avenue, NW., Washington, DC 20224.

## II.    NATURE OF THE FEDERAL TAX ISSUE AND ACTION

### A.    Federal Employment Taxes

6.    Pursuant to federal law, employers are required to withhold certain federal income taxes and taxes from the Federal Insurance Contributions Act ("FICA Payroll Taxes") from their employee's wages and other compensation.

7.    Pursuant to 26 U.S.C. §§ 3102, 3111, 3301 and 3402, employers are also required to pay their own portion of FICA Payroll Taxes and taxes from the Federal Unemployment Taxes and Federal Unemployment Tax Act ("FUTA Taxes"), and

FICA Payroll Taxes and FUTA Taxes are collectively commonly referred to as "employment taxes" or "payroll taxes".

8.    Pursuant to 26 U.S.C. §§ 6302 and 6157, as well as 26 C.F.R. §§ 31.6302-1, 31.6302(c)-1, and 31.6302(c)-3, employers are required to periodically deposit employment tax payments in certain prescribed federal deposit banks.

9.    Pursuant to 26 U.S.C. § 6011, as well as 26 C.F.R. § 31.6071(a)-1, employers are further required to file quarterly payroll tax returns ("IRS Form 941" or "Form 941") and annual returns for their FUTA Taxes.

**B.    The COVID-19 Pandemic-Related "CARES" Act Employee Retention Credit ("ERC")**

10.    At the outset of the global COVID-19 pandemic, the United States enacted the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act") on March 27, 2020, which provided numerous federal government programs and funding in response to the economic challenges faced by the American people, businesses, and taxpayers.[1]

11.    Amongst the CARES Act provisions, section 2301 provided for a new Employee Retention Credit ("ERC" or "ERTC"), which is a "refundable" tax credit applied against the employer-portion of businesses employment taxes for the period

---

[1] *See* The Coronavirus Aid, Relief and Economic Security Act (CARES Act), Pub. L. No 116-136, 134 Stat. 281 (2020).

from March 12 through December 31, 2020.[2]  Section 2301 of the CARES Act was later amended by the Taxpayer Certainty and Disaster Relief Act of 2020 (the "Relief Act") to extend ERC into the first two quarters of 2021.[3]  The American Rescue Plan Act of 2021 ("ARPA" or "ARPA 2021") further extended ERC through the end of 2021.[4]  The Infrastructure Investment and Jobs Act ("IIJA") later removed eligibility for most employers in the fourth quarter of 2021.[5]  The ERC credit was ultimately codified as 26 U.S.C. § 3134, where Title 26 is the "Internal Revenue Code."

12.    Pursuant to 26 U.S.C § 3134(c)(2)(A)(ii), ERC provides a few different avenues of qualification, and all aimed at both incentivizing and rewarding businesses maintaining employment during the COVID-19 pandemic in 2020 and 2021. Specifically:

a. Certain businesses meeting certain defined business disruption criteria by quarter were equally eligible for the same per employee refundable ERC tax credit by quarter,

---

[2] *See id.*

[3] *See* The Taxpayer Certainty and Disaster Relief Act of 2020, Pub. L. 116-260, Div. EE (2020).

[4] *See* The American Rescue Plan Act of 2021, Pub. L. 117-2, 135 Stat. 4 (March 11, 2021).

[5] *See* Infrastructure Investment and Jobs Act, Pub. L. 117-58, 135 Stat. 429 (Nov. 15, 2021).

b.  Businesses who demonstrated certain quantitatively defined gross receipt drops by quarter, as compared to pre-pandemic periods, were eligible for a per employee per quarter refundable ERC tax credit, or

c.  Certain businesses defined as "recovery startup businesses."

**C.    ERC Qualification – Partial Suspension of Business Operations**

13.    Pursuant to section 2301(c) of the CARES Act, as amended by section 207(a)(1) of the Relief Act, additionally amended by ARPA and IIJA, and finally codified in 26 U.S.C. § 3134, employers are eligible for the ERC tax credit in quarters where the:

"[O]peration of the trade or business described in clause (i) is fully or partially suspended during the calendar quarter due to orders from an appropriate governmental authority limiting commerce, travel, or group meetings (for commercial, social, religious, or other purposes) due to the coronavirus disease 2019 (COVID–19)".[6]

14.    In absence of a Treasury Regulation for authoritative interpretation of the Employee Retention Credit, the IRS Office of the Associate Chief Counsel issued Notice 2020-21, *Guidance on the Employee Retention Credit under Section 2301 of the Coronavirus Aid, Relief, and Economic Security Act*, on March 1, 2021.  Notice 2020-21 offered much needed IRS interpretation of the Employee Retention Credit

---

[6] CARES Act, Pub. L. No 116-136 at 2301(c).

program, including 71 Questions and Answers providing a variety of qualitative interpretations for different ERC issues.

15.    As applicable to partial suspension of operations, IRS Notice 2020-21 addresses this application in several areas, and per Question-and-Answer No. 15, if an employer is able to conduct comparable operations via its employees working via telework, then it would not constitute any suspension of operations for purposes of the ERC credit; but further states:

> "[I] if the closure of the workplace causes the employer to suspend business operations for certain purposes, but not others, it may be considered to have a partial suspension of operations due to the governmental order."[7]

16.    Additionally, as related to partial suspension of operations, per Question-and-Answer No. 17:

> "If all, or all but a nominal portion, of an employer's business operations may continue, but the operations are subject to modification due to a governmental order (for example, to satisfy distancing requirements), such a modification of operations is considered to be a partial suspension of business operations due to a governmental order if the modification required by the governmental order has more than a nominal effect on

---

[7] IRS Notice 2021-20, Q/A 15, pgs. 30-31.

the business operations under the facts and circumstances."[8]

17.    Further, Question and Answer No. 18 of Notice 2021-20 clarifies that a modification due to a government order alone is not enough but additionally clarifies that a partial suspension exists with a more than nominal effect on the business as a result of the government order and is based on the facts and circumstances of the respective taxpayer and claim.

18.    Amongst the manners in which an employer can demonstrate a more than nominal effect on the business as a result of a government order based on the facts of circumstances, include the following in Question-and-Answer No. 18 of Notice 2021-20:

> "A governmental order that results in a reduction in an employer's ability to provide goods or services in the normal course of the employer's business of not less than 10 percent will be deemed to have more than a nominal effect on the employer's business operations."[9]

**D.    COVID-19 Gov't Orders – Federal CARES Act §§ 4022, 4023, 4024 Mortgage Forbearance and Foreclosure & Eviction Moratoriums**

19.    Pursuant to section 4022 of the CARES Act, certain residential mortgage holders with federally-backed mortgage loans were provided additional forbearance

---

[8] *Id.* at Q/A 17, pgs. 34-45.
[9] *Id.* at Q/A 18, pg. 39

options of 180 to 360 days and a 60-day foreclosure moratorium, starting March 18, 2020, for which mortgage loan holder and service providers were required to provide and for which "federal-back mortgage loan" were defined under sub-section (a)(2) of 4022 and included those:

    a.  Insured by the Federal Housing Administration ("FHA") under title II of the National Housing Act (12 U.S.C. 1707 et seq.),

    b.  Insured under section 255 of the National Housing Act (12 U.S.C. 1715z–20),

    c.  Guaranteed under section 184 or 184A of the Housing and Community Development Act of 1992 (12 U.S.C. 1715z–13a, 1715z–13b),

    d.  Guaranteed or insured by the Department of Veterans Affairs,

    e.  Guaranteed or insured by the Department of Agriculture,

    f.  Made by the Department of Agriculture, or

    g.  Purchased or securitized by the Federal Home Loan Mortgage Corporation or the Federal National Mortgage Association.

20.    Pursuant to section 4023 of the CARES Act, certain residential property borrowers with Federally backed mortgage loans could request forbearance, due to the issues surrounding the COVID-19 pandemic; effective from the enactment of the CARES Act on March 27, 2020, through December 31, 2020.

21.     Pursuant to section 4024 of the CARES Act, lessees of certain residential properties with Federally backed mortgage loans, amongst other possible reasons, were exempt from being subject to eviction filings temporarily, due to the issues surrounding the COVID-19 pandemic; effective from the enactment of the CARES Act on March 27, 2020, and for the subsequent one-hundred and twenty (120) days.

22.     The federal government orders of sections 4022, 4023, and 4024 of the CARES Act, as summarized in statement nos. 19, 20, and 21 above, are the type of orders from an appropriate governmental authority limiting commerce, travel, or group meetings due to COVID-19 within the meaning and as contemplated by section 2301(c) of the CARES Act.

**E.  COVID-19 Gov't Orders – U.S. Dept. of Housing & Urban Dev. (HUD) Mortgage Forbearance and Eviction & Foreclosure Moratorium**

23.     Pursuant to 42 U.S.C. § 3533(b) and 12 U.S.C. § 1715b, the Assistant Secretary for Housing – Federal Housing Commissioner (the "Housing Commissioner") of the Defendant's nonparty agency, the Department of Housing and Urban Development ("HUD"), issued several Mortgagee Letters ("MLs") during 2020 and 2021 that were orders of the type limiting commerce, travel, or group meetings due to COVID-19 within the meaning and as contemplated by section

2301(c) of the CARES Act.[10]  See **<u>Exhibit A</u>** attached to this filing, *herein*, which are copies of the most relevant HUD COVID-19 MLs during 2020 and 2021.

24.    On March 18, 2020, the Housing Commissioner issued ML 2020-04, *Foreclosure and Eviction Moratorium in connection with the Presidentially-Declared COVID-19 National Emergency*, that mirrored section 4022 of the CARES Act and provided a foreclosure and eviction moratorium for all FHA-insured Single-Family mortgages for a period of 60 days.[11]

25.    The Housing Commissioner subsequently issued several other MLs in 2020 and 2021 that extended ML 2020-04's COVID-19 foreclosure and eviction moratorium several times, without any lapse, though at least September 30, 2021.[12]

26.    Additionally, on April 1, 2020, the Housing Commissioner issued ML 2020-06, *FHA's Loss Mitigation Options for Single Family Borrowers Affected by the Presidentially-Declared COVID-19 National Emergency in Accordance with the CARES Act*, which provided loss mitigation options to residential mortgage borrowers under the FHA Title II Single Family mortgage programs, including forbearance for

---

[10] *See* U.S. Dept. of Housing and Urban Development (HUD), ML 2020-04 (March 18, 2020); ML 2020-13 (May 14, 2020); ML 2020-19 (June 17, 2020); ML 2020-27 (Aug. 27, 2020); ML 2020-43 (Dec. 17, 2020); ML 2021-03 (Jan. 21, 2021); ML 2021-05 (Feb. 17, 2021); ML 2021-15 (June 25, 2021); ML 2021-19 (July 30, 2021).
[11] *Id.* at 2020-40.
[12] *Id.* at 2020-13; 2020-19; 2020-27; 2020-43; 2021-03; 2021-05; 2021-15; 2021-19.

borrowers affected by the COVID-19 National Emergency; effective through October 30, 2020.[13]

27.    The Housing Commissioner subsequently issued several other MLs in 2020 and 2021 that extended ML 2020-06's COVID-19 forbearance options several times, without any lapse, though at least September 30, 2021.[14]

**F.    COVID-19 Gov't Orders – U.S. Department of Veteran Affairs (VA) Mortgage Forbearance and Eviction & Foreclosure Moratorium**

28.    Pursuant to 38 U.S.C. § 512 and 38 C.F.R. § 2.6, the Director of Loan Guaranty Service (the "VA Loan Guaranty Director") for the U.S. Department of Veteran Affairs ("VA"), under the direction of the VA's Under Secretary for Benefits, issued several notifications to Circular 26 in 2020 and 2021 that were orders of the type limiting commerce, travel, or group meetings due to COVID-19 within the meaning and as contemplated by section 2301(c) of the CARES Act.[15]  See **Exhibit B** attached to this filing, *herein*, which are copies of the most relevant FHA COVID-19 Circular 26 updates during 2020 and 2021.

---

[13] *Id.* at 2020-06 (April 1, 2020).

[14] *See id.* at 2020-34 (Oct. 20, 2020); 2020-44 (Dec. 17, 2020); 2021-04 (Jan. 26, 2021); 2021-15.

[15] *See* U.S. Dept. of Veteran Affairs (VA), Circular 26 at -20-10 (March 27, 2020), -20-10 Change 1 (Sept. 9, 2020), -20-22 (June 17, 2020), -20-23 (June 17, 2020), -20-30 (Aug. 24, 2020), -20-40 (Dec. 28, 2020), -21-02 (Jan. 29, 2021), -21-05 (Feb. 16, 2021) & -21-10 (Sept. 29, 2021).

29.    On March 27, 2020, the VA Loan Guaranty Director issued Circular 26-20-10, *Lender Guidance for Borrowers Affected by COVID-19*, which amongst the guidance provided for greater flexibility for income verification on the approval of VA-insured residential mortgages.[16]

30.    On May 14, 2020, the VA Loan Guaranty Director issued Circular 26-20-18, *Extended Foreclosure Moratorium for Borrowers Affected by COVID-19*, which extended section 4022 of the CARES Act's 60-day period foreclosure moratorium, beginning March 18, 2020, for VA-guaranteed loans through June 30, 2020.[17]

31.    On June 17, 2020, the VA Loan Guaranty Director issued Circular 26-20-22, *Extended Foreclosure Moratorium for Borrowers Affected by COVID-19*, which extended Circular 26-20-18 and section 4022 of the CARES Act's foreclosure moratorium for VA-guaranteed loans through August 31, 2020.[18]

32.    On June 17, 2020, the VA Loan Guaranty Director issued Circular 26-20-23, *Extended Eviction Moratorium for Borrowers Affected by COVID-19*, which extended section 4022 of the CARES Act's 120-day period eviction moratorium, beginning March 18, 2020, for VA-guaranteed loans through August 31, 2020.[19]

---

[16] *Id.* at -20-10.
[17] *Id.* at -20-18.
[18] *Id.* at -20-22.
[19] *Id.* at -20-23.

33.    On August 24, 2020, the VA Loan Guaranty Director issued Circular 26-20-29, *Extended Eviction Moratorium for Borrowers Affected by COVID-19*, which extended Circular 26-20-23 and section 4022 of the CARES Act's eviction moratorium for VA-guaranteed loans through December 31, 2020.[20]

34.    On August 24, 2020, the VA Loan Guaranty Director issued Circular 26-20-30, *Extended Foreclosure Moratorium for Borrowers Affected by COVID-19*, which extended Circular 26-20-18 & -22 and section 4022 of the CARES Act's foreclosure moratorium for VA-guaranteed loans through December 31, 2020.[21]

35.    On December 28, 2020, the VA Loan Guaranty Director issued Circular 26-20-40, *Extended Foreclosure and Eviction Relief*, which extended Circular 26-20-18, -22 & -30's foreclosure moratorium and -23 & -29's eviction moratorium for VA-guaranteed loans through February 28, 2021.[22]

36.    On January 29, 2021, the VA Loan Guaranty Director issued Circular 26-21-02, *Extended Foreclosure and Eviction Relief for Borrowers Affected by COVID-19*, that further extended both the foreclosure and eviction moratoriums for VA-guaranteed loans through March 31, 2021.[23]

---

[20] *Id.* at -20-29.
[21] *Id.* at -20-30.
[22] *Id.* at -20-40.
[23] *Id.* at -21-02.

37.    On February 16, 2021, the VA Loan Guaranty Director issued Circular 26-21-05, *Extended Foreclosure and Eviction Relief for Borrowers Affected by COVID-19*, that further extended both the foreclosure and eviction moratoriums for VA-guaranteed loans through June 30, 2021.[24]

38.    On June 25, 2021, the VA Loan Guaranty Director issued Circular 26-21-10, *Relief for Borrowers Affected by COVID-19*, that further extended both the foreclosure and eviction moratoriums for VA-guaranteed loans through July 31, 2021.[25]

39.    Further via Circular 26-21-10, the VA Loan Guaranty Director provided for forbearance options and flexibility, associated with the COVID-19 pandemic, through at least September 30, 2021.[26]

40.    On July 30, 2021, the VA Loan Guaranty Director issued Circular 26-21-14, *Extended Foreclosure and Eviction Relief for Borrowers Affected by COVID-19*, that further extended both the foreclosure and eviction moratoriums for VA-guaranteed loans through September 30, 2021.[27]

**G.    COVID-19 Gov't Orders – U.S. Consumer Financial Protection Bureau (CFPB) - 12 C.F.R. Part 1024 – Mortgage Loss Mitigation & Forbearance**

---

[24] *Id.* at -21-05.
[25] *Id.* at -21-10, no. 6.
[26] *Id.* at nos, 4 & 5.
[27] *Id.* at -21-14.

41.    Pursuant to 12 U.S.C. § 5491, the Director of the Consumer Financial Protection Bureau ("CFPB") issued the CFPB's final rule to amend Regulation X, *Protections for Borrowers Affected by the COVID-19 Emergency Under the Real Estate*, on June 25, 2021 (the "CFPB Final Rule") to assist mortgage borrowers affected by the COVID-19 emergency that included orders of the type limiting commerce, travel, or group meetings due to COVID-19 within the meaning and as contemplated by section 2301(c) of the CARES Act.[28]  See **Exhibit C** attached to this filing, *herein*, which is a copy of the CFPB Final Rule.

42.    The CFPB Final Rule required mortgage loan service providers, effective August 31, 2021, and until January 1, 2022, to provide specific loss mitigation options to borrowers and offer protections against foreclosure initiation until January 1, 2022, and as consistent with the provisions of section 4022 of the CARES Act.[29]

43.    Further, the CFPB Final Rule defined borrowers impacted by the COVID-19 pandemic, and thus eligible for the CFPB Final Rule loss mitigation options and foreclosure mortarium, as a borrower who experienced:

"[A] financial hardship due, directly or indirectly, to the national emergency for the COVID-19 pandemic declared in Proclamation 9994

---

[28] *See* 12 C.F.R Part 1024, 86 FR 34848 (June 25, 2021); *see also Seila Law LLC v. Consumer Financial Protection Bureau*, 601 U.S. 416 (2024).
[29] *See* 12 C.F.R Part 1024; *see also* CARES Act, Pub. L. No 116-136 at 4022.

on March 13, 2020 (beginning on March 1,2020) and continued on February 24, 2021, in accordance with section 202(d) of the National Emergencies Act (50 U.S.C.1622(d)).”[30]

## H.    COVID-19 Gov't Orders - California Mortgage Forbearance and Foreclosure & Eviction Moratoriums

44.    At the early stages of the COVID-19 pandemic, California Governor Gavin Newsom signed into law Assembly Bill No. 3088, the Tenant, Homeowner, and Small Landlord Relief and Stabilization Act of 2020 (“CA AB 3088”), which included orders that were of the type limiting commerce, travel, or group meetings due to COVID-19 within the meaning and as contemplated by section 2301(c) of the CARES Act.[31]

45.    Chapter 2, Section 3273.10 of CA AB 3088 provided comprehensive mortgage forbearance options, similar to those afforded in the federal CARES Act, for residential mortgages for California property for March 1, 2020, through January 31, 2021.[32]

46.    CA AB 3088 further provides an eviction moratorium for tenants of California residential properties, comparable to the eviction moratorium of the federal

---

[30] 12 C.F.R Part 1024 at pg. 31.
[31] *See* The Tenant, Homeowner, and Small Landlord Relief and Stabilization Act of 2020, Cal. A.B. No. 3088 (Aug. 31, 2020)
[32] *See id.*

CARES Act, with respect to non-payments of rent for the March 1, 2020, through January 31, 2021 time period.[33]

47.    On January 29, 2021, Governor Newsom signed into law Senate Bill No. 91, the COVID-19 Tenant Relief Act ("CA SB 91"), which extended the California residential mortgage forbearance of CA AB 3088 per statement no. 44 above to September 1, 2021.[34]

48.    CA SB 91 additionally extended the California eviction moratorium to June 30, 2021.[35]

49.    On June 28, 2021, Governor Newsom signed into law Assembly Bill No. 832, the COVID-19 Rental Housing Recovery Act ("CA AB 832"), which extended the California eviction moratorium to September 30, 2021.[36]

## I.    COVID-19 Gov't Orders - California Statewide
## Stay-At-Home and Personal Behavior Requirements

50.    Pursuant to Cal. Govt. Code § 8625, Governor Newsom issued a California-statewide Emergency Declaration on March 4, 2020, due to the COVID-19 pandemic, (the "CA March 2020 Emergency Declaration") and that included

---

[33] *See id,*
[34] *See* The COVID-19 Tenant Relief Act, Cal. S.B. 91 (Jan. 29, 2021).
[35] *See id.*
[36] *See* The COVID-19 Rental Housing Recovery Act, Cal. A.B. 832 (Sept. 30, 2021).

1  orders of the type limiting commerce, travel, or group meetings due to COVID-19

2  within the meaning and as contemplated by section 2301(c) of the CARES Act.[37]

3        51.    Pursuant Cal. Govt. Code §§ 8567, 8627 & 8665 and the CA March 2020

4

5  Emergency Declaration, Governor Newsom further issued several California-

6  statewide Executive Orders ("EOs") throughout 2020 and 2021, as a result of the

7  COVID-19 pandemic and that included orders of the type limiting commerce, travel,

8

9  or group meetings due to COVID-19 within the meaning and as contemplated by

10  section 2301(c) of the CARES Act.[38]  See **<u>Exhibit D</u>** attached to this filing, *herein*,

11  which are copies of the most relevant California COVID-19 Executive Orders during

12

13  2020 and 2021, as well as the CA March 2020 Emergency Declaration.

14        52.    On March 12, 2020, Governor Newsom issued EO No. N-25-20, which

15  stipulated several COVID-19 requirements for all California residents, including

16

17  adhering to strict personal behavior requirements to limit the spread of the virus, such

18  as adhering to social distancing requirements.[39]

19        53.    On March 19, 2020, Governor Newsom issued EO No. N-33-20 that

20

21  provided for all California residents to "stay home or at their place of residence except

22

23

---

24  [37] *See* California, Executive Department [Gavin Newsom], Proclamation of a State of Emergency (March 4, 2020).

25  [38] *See* California, Executive Department [Gavin Newsom], Executive Order Nos. N-25-20 (March 12, 2020), N-33-20 (March 19, 2020), N-37-20 (March 27, 2020), N-

26  41-20 (April 1, 2020), N-48-20 (April 9, 2020), N-51-20 (April 16, 2020), N-60-20 (May 4, 2020), N-62-20 (May 6, 2020), N-66-20 (May 29, 2020), N-84-20 (Dec. 14,

27  2020), N-07-21 (June 11, 2021) & N-08-21 (June 11, 2021).
[39] *Id.* at N-25-20.

28

as needed to maintain continuity of operations of the federal critical infrastructure sectors," effectively immediately.[40]

54.    Through the remainder of 2020 and into 2021, Governor Newsom issued several other EOs that continually referenced the N-33-20 Stay-At-Home Order of statement no. 53 above, in minimal and targeted relaxations of the order, until Governor Newsom rescinded N-33-20 Order per N-07 & -08-21 on June 11, 2021.[41]

### J.    COVID-19 Gov't Orders - Arizona Statewide Stay-At-Home and Personal Behavior Requirements

55.    Pursuant to Ariz. Rev. Stat. (A.R.S.) §§ 26-303(D) & 206-31(15), Arizona Governor Doug Ducey declared an Arizona-statewide emergency declaration on March 11, 2020, due to the COVID-19 pandemic (the "AZ March 2020 Emergency Declaration").[42]

56.    Further, pursuant to A.R.S. §§ 36-787, -788 & -789 and the March 11, 2020 Emergency Declaration, Governor Ducey issued several Executive Orders that included orders of the type limiting commerce, travel, or group meetings due to COVID-19 within the meaning and as contemplated by section 2301(c) of the CARES Act.[43]   See **Exhibit E** attached to this filing, *herein*, which are copies of the most

---

[40] *Id.* at N-33-20.
[41] *Id.* at N-37-20, -41-20, -48-20, -51-20, -60-20, -62-20, -66-20, -84-20, -07-21 & -08-21.
[42] *See* Arizona, Office of the Governor [Doug Ducey], Declaration of Emergency, COVID-19 (March 11, 2020).
[43] *See* Arizona, Office of the Governor [Doug Ducey], Executive Order Nos. 2020-09 (March 19, 2020), 2020-12 (March 23, 2020), 2020-18 (March 30, 2020), 2020-24 (April 7, 2020), 2020-33 (April 29, 2020), 2020-34 (May 4, 2020), 2020-36 (May 12,

relevant Arizona COVID-19 Executive Orders during 2020 and 2021, as well as the AZ March 2020 Emergency Declaration.

57.    On March 19, 2020, Governor Ducey issued EO No. 2020-09 that limited the operations of certain Arizona businesses, so as to attempt to mitigate the spread of the COVID-19 virus, remaining in effect until further notice.[44]

58.    On March 30, 2020, Governor Ducey issued EO No. 2020-18 that provided for a variety of requirements for Arizona residents and businesses as a result of the COVID-19 pandemic, including limiting activity outside of individuals own residents, social distancing requirements, occupancy constraints, and other personal behavior requirements.[45]

59.    Through the remainder of 2020 and into 2021, Governor Ducey issued several other EOs that continually extended the COVID-19 restrictions of EO Nos. 2020-09 & -18, *et al*, and as described in statement nos. 57 and 58 above until Governor Ducey began easing such requirements with their ultimate recission of EO Nos. 2021-05, -06 & -16 on March 5, 2021, March 25, 2021, and July 2, 2021.[46]

### K.    COVID-19 Gov't Orders – Other State and Local

_____

2020), 2020-40 (June 17, 2020), 2020-43 (June 29, 2020), 2020-47 (July 9, 2020), 2020-52 (July 23, 2020), 2020-60 (Dec. 2, 2020), 2021-05 (March 5, 2021), 2021-06 (March 25, 2021) & 2021-16 (July 6, 2021).
[44] *Id.* at 2020-09.
[45] *Id.* at 2020-18.
[46] *See id.* at 2020-24, 2020-33, 2020-34, 2020-36, 2020-40, 2020-43, 2020-47, 2020-52, 2020-60, 2021-05, 2021-06 & 2021-16.

60.     Throughout 2020 and 2021, many other states, including Colorado and Michigan, as well as some local governments such as those for the California cities of Los Angeles, San Francisco, Oakland, and San Diego, issued government orders providing for residential mortgage forbearance and other loss mitigation options and foreclosure and evictions moratoriums, as comparable to the orders as described in statement nos. 19 through 49 above, which were of the type limiting commerce, travel, or group meetings due to COVID-19 within the meaning and as contemplated by section 2301(c) of the CARES Act.

61.     Throughout 2020 and 2021, many other states, including Colorado, Michigan, and Texas, issued government orders mandating jurisdictional residents to stay home absent an essential needs and provide for mandatory personal behavior requirements such as social distancing and indoor occupancy contracts, which were comparable to the orders as described in statement nos. 50 through 59 above and were of the type limiting commerce, travel, or group meetings due to COVID-19 within the meaning and as contemplated by section 2301(c) of the CARES Act.

### L.    ERC – Credit Amount Determination

62.     For the March 12 through December 31, 2020, time periods and pursuant to sections 2301(a) and (b)(1) of the CARES Act, eligible employers receive a tax credit against employment taxes of up to 50 percent of qualified wages ($10,000 per

employee for the **year** including certain health care expense), but no more than $5,000 per employee total for the 2020 year.

63.    For the July 1 through September 30, 2021 time period (the third quarter of 2021) and pursuant to sections 2301(a) and (b)(1) of the CARES Act, as amended by sections 207(b) and (c) of the Relief Act, additionally amended by ARPA and IIJA and latter codified in 26 U.S.C. §§ 3134(a) & (b)(1)(A), eligible employers receive a tax credit against employment taxes of up to 70 percent ($10,000 per employee per calendar quarter including certain health care expenses), but no more than $7,000 per quarter per employee for each eligible 2021 quarter.

64.    Section 2301(g) of the CARES Act, as amended by section 206(c)(2) of the Relief Act, and 26 U.S.C. § 3134(h)(2) provide that any payroll costs covered as "forgiven" by the Paycheck Protection Program (PPP) of the 2020 CARES Act are excluded "qualifying wages" for purposes of the ERC tax credits.[47]

**M.    ERC – Refundability and Amendment for Refund Claim**

65.    Pursuant to section 2301(b), *et al*, and 26 U.S.C. § 3134(b), ERC tax credit claims are first used to offset employment taxes for the respective period, and any excess is further "refunded" to the taxpayer claimant per 26 U.S.C. §§ 6402(a) and 6413(b).

---

[47] *See also* The Coronavirus Aid, Relief and Economic Security Act (CARES Act), Pub. L. No 116-136, 134 Stat. 281(2020).

66.     Pursuant to 26 U.S.C. § 6511, taxpayers have up to three (3) years from the date of filing a tax return to amend the same return for a claim for refund or credit of taxes, and further pursuant to 26 U.S.C. § 6513(c), the date of filing for payroll tax returns are deemed filed on April 15th of the succeeding calendar year.

**N.     Submitting Amended Tax Returns & Other Tax Documents to the IRS**

67.     Pursuant to 26 U.S.C. § 7502, the "date of delivery" of any taxpayer's submission or filing of "any return, claim, statement, or other document" submitted by mail is the postmark date of the mailing.

68.     Pursuant to 26 U.S.C. § 7502(c) and 26 C.F.R. § 301.7502-1, such mailings described in statement no. 67 above that are mailed via the United States Postal Service (USPS) via "registered mail" or "certified mail" is *prima facie* evidence that such a mailing was "delivered" to the IRS on the postmark date; the postmark date being the date of registered mail registration and/or certified mail payment.

69.     Further, pursuant to 26 U.S.C. § 7502(c) and 26 C.F.R. § 301.7502-1, the IRS may also identify "Private Delivery Services" ("PDS"), e.g. DHL Express, FedEx, and UPS, from time-to-time that are permitted to serve in place of USPS

mailings for purposes of applying the rules of 26 U.S.C. § 7502 and 26 C.F.R. § 301.7502-1.[48]

### III.    PLAINTIFF BACKGROUND AND FACTUAL ASSERTIONS

#### A.    Company Overview – Mortgage Loan Service Provider

70.    Based in Orange County, California, Titan Mutual is a multi-state licensed mortgage lender, for which it originates and finances home mortgage loans for residential homeowners with additional employees and operations in the greater-Phoenix, Arizona area.

71.    During the 2nd, 3rd & 4th quarters of 2020 and the 1st, 2nd & 3rd quarters of 2021, Titan Mutual had employees and operations in California, Arizona, Colorado, Michigan, and Texas.

72.    During the 2nd, 3rd & 4th quarters of 2020 and the 1st, 2nd & 3rd quarters of 2021, Plaintiff had less than five hundred (500) employees for its payroll tax return filings, operationally domestically and were subject to FICA Payroll Taxes.

73.    During the entirety of calendar years 2019, 2020, and 2021, Plaintiff could account for all revenues classified in the following four (4) categories of mortgages:

a.  FHA-Insured,

---

[48] *See also* Private Delivery Services PDS, Internal Revenue Service, https://www.irs.gov/filing/private-delivery-services-pds.

b.  VA-Guaranteed,

c.  Conventional, and

d.  Non-Conventional/Qualifying.

74.    Separately and in the alternative to the revenue classification of statement no. 73 above, during the entirety of calendar years 2019, 2020, and 2021, Plaintiff could account for all revenues classified in the following three (3) categories of mortgages product originations:

a.  Outside Origination Refinance/ Purchase,

b.  Inside Consumer Direct Refinance, and

c.  Inside Consumer Direct Purchase.

75.    Unique amongst the three origination classifications of Plaintiff's revenue per statement no. 74 above, Plaintiff's revenue per the "Outside Origination Refinance/ Purchase" especially required the use of in-person activities to effectuate its operations, and no comparable method for "Outside Origination Refinance/Purchase" revenues' operations existed via "telework".

**B.    COVID-19 Partial Suspension #1 – FHA-Insured Mortgages**

76.    Prior to the onset of the COVID-19 pandemic and during the 2019 Calendar Year, FHA-insured mortgages were more than a nominal portion of Plaintiff's operations.

77.     Throughout the 2nd, 3rd & 4th quarters of 2020 and the 1st, 2nd & 3rd quarters of 2021, the CARES Act, HUD, CFPB, California, Arizona, and other state COVID-19 government orders with respect to residential mortgages that are FHA-Insured, per statement nos. 19 through 27, 41 through 49, and 60 above, required Titan Mutal to modify its operations.

78.     Throughout the 2nd, 3rd & 4th quarters of 2020 and the 1st, 2nd & 3rd quarters of 2021, Plaintiff's modifications for the FHA-Insured mortgages required by the governmental order per statement no. 77 above had more than a nominal effect on the business operations under the facts and circumstances.

**C.     COVID-19 Partial Suspension #2 – VA-Guaranteed Mortgages**

79.     Prior to the onset of the COVID-19 pandemic and during the 2019 Calendar Year, VA-guaranteed mortgages were more than a nominal portion of Plaintiff's operations.

80.     Throughout the 2nd, 3rd & 4th quarters of 2020 and the 1st, 2nd & 3rd quarters of 2021, the CARES Act, VA, CFPB, California, Arizona, and other state COVID-19 government orders with respect to residential mortgages that are VA-guaranteed, per statement nos. 19 through 22, 26 through 49, and 60 above, required Titan Mutal to modify its operations.

81.     Throughout the 2nd, 3rd & 4th quarters of 2020 and the 1st, 2nd & 3rd quarters of 2021, Plaintiff's modifications for the VA-Guaranteed mortgages required

by the governmental order per statement no. 80 above had more than a nominal effect on the business operations under the facts and circumstances.

### D.     COVID-19 Partial Suspension #3

### Outside Origination Refinance/Purchase

82.     Prior to the onset of the COVID-19 pandemic and during the 2019 Calendar Year, Plaintiff's revenues classified as "Outside Origination Refinance/Purchase" were more than a nominal portion of Plaintiff's operations.

83.     Throughout the 2nd, 3rd & 4th quarters of 2020 and the 1st, 2nd & 3rd quarters of 2021, the COVID-19 government orders, per statement nos. 19 through 61 above, required Titan Mutal to modify its operations.

84.     Throughout the 2nd, 3rd & 4th quarters of 2020 and the 1st, 2nd & 3rd quarters of 2021, Plaintiff could not perform "Outside Origination Refinance/Purchase" via telework in a comparable manner, as a result of the business operation modifications per statement no. 83 above.

85.     Throughout the 2nd, 3rd & 4th quarters of 2020 and the 1st, 2nd & 3rd quarters of 2021, Plaintiff's modifications for the "Outside Origination Refinance/Purchase" operations required by the governmental order per statement no. 84 above had more than a nominal effect on the business operations under the facts and circumstances

86.    Additionally or in the alternative, throughout the 2nd, 3rd & 4th quarters of 2020 and the 1st, 2nd & 3rd quarters of 2021, Plaintiff's "Outside Origination Refinance/ Purchase portion" of its business experienced a reduction of gross receipts due to the federal and state COVID-19 governmental orders per statement nos. 83 above, and that required modifications per statement no. 84 above, relative to the same corresponding quarter in 2019, as summarized in the following table:

| i. Payroll Tax Quarter End | ii.  Revenue - Outside Origination Refinance/ Purchase | iii.  Revenue Reduction Relative to 2019 Quarter [= (2019Q - 20/21Q) / 2019Q] |
| --- | --- | --- |
| a.    3/31/2019 | 848,323.37 | n/a |
| b.    6/30/2019 | 807,537.68 | n/a |
| c.    9/30/2019 | 712,058.42 | n/a |
| d.    12/31/2019 | 684,328.86 | n/a |
| e.    3/31/2020 | 478,765.67 | 43.56% |
| f.    6/30/2020 | 455,951.14 | 43.54% |
| g.    9/30/2020 | 389,070.31 | 45.36% |
| h.    12/31/2020 | 321,639.68 | 53.00% |
| i.    3/31/2021 | 323,271.21 | 61.89% |
| j.    6/30/2021 | 385,183.80 | 52.30% |
| k.    9/30/2021 | 327,757.60 | 53.97% |

**E.    Plaintiff ERC Credit Claims**

87.    For the 2nd, 3rd & 4th quarters of 2020 and the 1st, 2nd & 3rd quarters of 2021, Plaintiff timely determined and executed its quarterly and annual employment tax payment and reporting; most specifically through its timely filed quarterly reports via the IRS Forms 941, *Employer's QUARTERLY Federal Tax Return*.    For its original timely filings, Plaintiff did not claim the ERC tax credits.

88.    Subsequently, Plaintiff determined that it qualified for ERC tax credits for the 2nd, 3rd & 4th quarters of 2020 and the 1st, 2nd & 3rd quarters of 2021 pursuant to the "Full or Partial Suspension of Operations" qualification test of   section 2301(c)(2)(A)(ii)(I) of the CARES Act, as amended by section 207(d)(1)(A) of the Relief Act, and further codified in 26 U.S.C. § 3134(c)(2)(A)(ii)(I); insomuch as Titan Mutual experienced multiple partial suspensions per statement nos. 76 through 86.

89.    Further, Plaintiff calculated its ERC tax credits for the 2nd, 3rd & 4th quarters of 2020 and the 1st, 2nd & 3rd quarters of 2021 as summarized in the table below:

| i. Payroll Tax Quarter End | ii. Total ERC Credit Refund Claim |
|---|---|
| a.   6/30/2020 | 467,551.15 |
| b.   9/30/2020 | 152,947.78 |
| c.   12/31/2020 | 210,403.19 |
| d.   3/31/2021 | 1,260,914.71 |

| i. Payroll Tax Quarter End | ii. Total ERC Credit Refund Claim |
|---|---|
| e.  6/30/2021 | 1,511,118.71 |
| f.  9/30/2021 | 1,457,516.98 |
| g.  Total | 5,060,452.52 |

90.    On or before June 26, 2023, Plaintiff timely filed amended quarterly federal employment tax reports with Defendant's nonparty agency, the IRS, for the 2nd, 3rd & 4th quarters of 2020 and the 1st, 2nd & 3rd quarters of 2021 with claims for refund requested pursuant to the ERC tax credits for these quarters (hereafter collectively referred to as the "Plaintiff's ERC Credit Claims") in the amounts summarized in statement no. 89 above and filed via Forms 941-X, *Adjusted Employer's QUARTERLY Federal Tax Return or Claim for Refund*.

91.    On July 25, 2024, the IRS sent a form letter no. 105C to Plaintiff (Ref. No. 0448626882) fully disallowing Plaintiff's ERC Credit Claim for the 3rd quarter of 2021 only, claiming lack of qualification, despite not having previously conducted an examination or audit of the claim.

92.    Plaintiff promptly filed its Protest Letter against the IRS's decision in the letter of July 25, 2024, for the IRS Independent Office of Appeals to provide an independent review of the disputed claim for the 3rd quarter of 2021.

93.    Since the filings described in statement no. 90 above, and the mutual correspondence between the IRS and Plaintiff described in statement nos. 91 and 92

above, Defendant and IRS have further failed to issue any further notices of audit, examination, disallowance, or deficiency that may justify any further refund delays.

94.    Since the filings described in statement no. 90 above, and the mutual correspondence between the IRS and Plaintiff described in statement nos. 91 and 92 above, Defendant or the IRS have made no claim to the Plaintiff of any federal taxes owed by Plaintiff, regardless of nature and time period, under Title 26 of the United State Code that the ERC credits for the Plaintiff's ERC Credit Claims would be appropriate to use as an offset for any such owed taxes.

95.    Since the filings described in statement no. 90 above, and the mutual correspondence between the IRS and Plaintiff described in statement nos. 91 and 92 above, Defendant or the IRS has failed to issue a refund to the Plaintiff for the Plaintiff's ERC Credit Claims.

## IV.   CAUSE OF ACTION

96.    A taxpayer of the United States is permitted to file a delayed refund suit against the United States, pursuant to 26 U.S.C. §§ 7422 and 6532, for the recovery of taxes imposed under Title 26 of the U.S. Code in U.S. District Court, provided:

a.  a claim for refund has been filed with the IRS,

b.  it has been at least six months from the date of such filing, or

c.  it has been two years from the date the IRS notified the taxpayer that such a claim has been disallowed.

97.     Plaintiff is an American taxpayer who has filed claims for refunds of its

employment taxes imposed under Title 26 as summarized in the table below:

| i. IRS Form | ii. Payroll Tax Quarter End | iii. Total ERC Credit Refund Claim | iv. Filing Date (Or on Before) |
|---|---|---|---|
| a. 941-X | 6/30/2020 | 467,551.15 | 6/26/2023 |
| b. 941-X | 9/30/2020 | 152,947.78 | 6/26/2023 |
| c. 941-X | 12/31/2020 | 210,403.19 | 6/26/2023 |
| d. 941-X | 3/31/2021 | 1,260,914.71 | 6/26/2023 |
| e. 941-X | 6/30/2021 | 1,511,118.71 | 6/26/2023 |
| f. 941-X | 9/30/2021 | 1,457,516.98 | 6/26/2023 |
| g. Total | | 5,060,452.52 | |

98.     Defendant, the United States of America, via its nonparty agency, the

IRS, has failed to issue the claimed refunds to the Plaintiff, and has only notified

Plaintiff of a single claim disallowance, for the 3rd quarter of 2021, on or before June

26, 2023

99.     It has been longer than six months since the Plaintiff has filed the refund

claims, and it has yet been two years from any notice of disallowance by the IRS to

the Plaintiff.

100.   Plaintiff is entitled to the credits and its claims for refund as claimed and identified in statement no. 97 above, including any additional interest it is entitled to under 26 U.S.C. § 6611.

101.   Plaintiff is entitled to reasonable attorney's fees and legal costs associated with this cause of action pursuant to 26 U.S.C. § 7430.

## V.   PRAYER FOR RELIEF

WHEREFORE, the Plaintiff prays this Court orders the Defendant, United States:

- Issue refunds for the Plaintiff's claim for refund of taxes of $5,060,452.52.

- Issue additional refunds to Plaintiff for any interest entitled to it under 26 U.S.C. § 6611.

- Award Plaintiff reasonable attorney's fees and other legal costs permissible under 26 U.S.C. § 7430.

///

///

///

## VI.   TRIAL BY JURY DEMANDED

Plaintiff demands a trial by jury for all issues so triable.


Dated:  April 2, 2025                    FREUNDLEGAL

                                         **_/s/_ Jonathan D. Freund**
                                         Jonathan D. Freund
                                         Attorney for Plaintiff
                                         TITAN MUTUAL LENDING, INC.

                                         JUSTIN H. DILAURO, ESQ.

                                         **_/s/_  Justin H. DiLauro**
                                         Justin H. DiLauro
                                         Attorney For Plaintiff
                                         TITAN MUTUAL LENDING, INC.

                                         [*Pro Hac Vice Pending*]